## OAK WOODS CEMETERY ASS'N v. COMMISSIONER OF INTERNAL REVENUE.

## EVERGREEN CEMETERY ASS'N v. SAME.

### Nos. 6891, 7008.

Circuit Court of Appeals, Seventh Circuit.
May 3, 1940.

No. 6891:

Paul E. Shorb and M. P. Wormhoudt, both of Washington, D. C. (Covington, Burling, Rublee, Acheson & Shorb, of Washington, D. C., of counsel), for petitioner.

Samuel O. Clark, Jr., Sewall Key, J. Louis Monarch, Howard P. Locke, J. P. Wenchel, and John W. Smith, all of Washington, D. C., for respondent.

No. 7008:

Hyland J. Paullin, of Chicago, Ill., for petitioner.

Samuel O. Clark, Jr., Sewall Key, Howard P. Locke, J. P. Wenchel, and John M. Morawski, all of Washington, D. C., for respondent.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

These are appeals from orders of redetermination entered by the Board of Tax Appeals declaring that the petitioner the Oak Woods Cemetery Association in appeal No. 6891 is liable for deficiencies in income taxes for the years 1931 and 1932 in the respective amounts of $5,439.12 and $4,668.02, and that the petitioner Evergreen Cemetery Association in appeal No. 7008 is liable for deficiencies in income taxes for the years 1927 and 1928 in the respective amounts of $4,168.84 and $3,274.82.

The cases were submitted together and involve but a single question. The cemetery lots sold in 1927, 1928, 1931, and 1932 had been acquired prior to 1913 at a cost less than the fair market value thereof on March 1, 1913, and the controversy here is concerning the proper value of the unadjusted basis to be used in determining the recognized gain in the respective years in which the lots were sold.

The Oak Woods Cemetery Association, in its income tax returns for the sale of burial space in 1931 and 1932, computed gain therefrom by using values on March

1, 1913, of $1.50, $1,60, $2 and $3 per square foot. The Evergreen Cemetery Association, in its income tax returns for the sale of burial space in 1927 and 1928, computed gains therefrom by using values on March 1, 1913 of 56.33 cents per square foot.

The Commissioner of Internal Revenue[1] in appeal No. 6891, Oak Woods, fixed the value at 23 cents per square foot, and in appeal No. 7008, Evergreen, at 16.8 cents per square foot. Oak Woods and Evergreen appealed to the Board of Tax Appeals, which determined the value at 42 cents per square foot in the Oak Woods case and 16.8 cents per square foot in the Evergreen case.

*The Oak Woods Cemetery Association.* This taxpayer, an Illinois corporation, was created in 1853 to acquire land for a cemetery and to sell and to convey space suitable for the burial of the dead, and its property was exempt from taxation. In 1853 it purchased 180 acres of land in the city of Chicago, which was prepared for cemetery purposes. Prior to March 1, 1913, the surrounding territory had been built up with high class residences and was thickly populated. At about that time the neighborhood began to decline and has since become a negro section.

On March 1, 1913, the physical condition of the cemetery was about the same as it was in 1937. All the sections had been laid out and were improved with sewers, drains and water systems; the roads were hard surfaced; it had been landscaped, well kept; had a substantial clientele and the reputation as being one of the best cemeteries in that part of the country. It was non-sectarian and not restricted as to nationality or color. Mausoleums, monuments, tombstones and other markers having a value of about $3,000,000 had been erected in the cemetery.

There were twelve other cemeteries within the city limits of Chicago, all of them being located on the north side of Chicago. There were thirty-nine cemeteries in the Chicago area with approximately 121,000,-000 square feet of unsold burial space, and from 1914 to 1929 nineteen new cemeteries were created with a total of 69,000,000 square feet.

Prior to March 1, 1913 Oak Woods had sold in excess of 3,250,000 square feet of burial space and on March 1, 1913, it had available for sale about two and one-half million square feet. It had never conducted a sales campaign for the sale of burial space, and sales were made only to such persons as would come to the office. Its policy was to increase prices gradually as the available cemetery land in Chicago decreased. The increase in the average square foot selling price from 1865 to 1913, and from 1913 to 1932, was equivalent to an interest rate of about 4½ per centum on the sales price in 1865, compounded annually.

Oak Woods sold space by lots, select graves and by graves, and purchasers were given a deed which provided that Oak Woods granted the space sold as a place of interment forever. It also sold perpetual care separately from the lots and graves. The cemetery was divided in seventy-four sections and subsections, of which forty-nine were open for sale prior to 1913. During the taxable years involved sales were made in fifty-one sections and subsections. Prior to March 1, 1913, sales had been made in all but eleven of the fifty-one sections. On March 1, 1913, it had for sale subdivided sections and subsections containing in excess of 816,000 square feet, partly subdivided sections and subsections containing in excess of 40,000 square feet, and undivided sections and subsections in excess of 1,596,000 square feet, all of which was salable. It could not, however, on March 1, 1913, have determined with exactness what unsubdivided sections would be devoted to particular classes of burial space.

From 29 interments in 1866 the number per year increased to 3,929 in 1892, after which year the number declined gradually to 1737 in 1913. In 1931 and 1933, 1,209 and 1,198 interments respectively were made. On March 1, 1913, the interments totaled 88,000 and by the end of 1932 they numbered 118,603. Chicago's population increased from 200,000 in 1866 to 2,185,283 in 1910 and to 2,523,000 in 1932. The number of deaths increased from 6,524 in 1866 to over 35,000 in 1913, and in 1932 to slightly in excess of 34,000. The percentage of deaths per 1,000 population de-

---

[1] Hereinafter the Commissioner of Internal Revenue will be referred to as Commissioner, The Oak Woods Cemetery Association as Oak Woods, Evergreen Cemetery Association as Evergreen and the Board of Tax Appeals as the Board.

creased from 3.2% in 1866 to 1.5% in 1913 and .9% in 1932.

Prior to March 1, 1913, sales of space had been made at wholesale prices from a low of six cents per square foot to a high of 89 cents, in excess of 68,000 square feet. In 1912 a proposal had been made to construct a large community mausoleum on a $100,000 plot of ground, in which crypts would be sold to the public, Oak Woods to share in the profits. It was rejected mainly for the reason that Oak Woods was unable to take steps to maintain perpetually a building of that size and it considered that the maintenance of the building might prove burdensome. Other considerations were that Oak Woods did not wish to go into business with someone else and that it did not care to sell at $2 per square foot.

The annual average sale of square feet from 1865 to 1913 was 66,720 square feet. During that period the average square foot selling price increased from 17¢ in 1865 to $1.39 in 1913 or an average annual increase of 2.5 cents per square foot. While the average net selling price per square foot for space in Section I was $7.31 for 1912 and $4.71 for the period 1909 through 1913, only a comparatively small amount of space was being disposed of from this Section, and the net sales for that period in this Section amounted to 2,952.06 square feet. Gross sales in this Section averaged $1.46 per square foot in 1909, $1.79 in 1910, $1.50 in 1911, $1.54 in 1912 and $1.40 in 1913, or at an average price of $1.64 for the period from 1909 through 1913. In 1915, the first year after 1913, when it sold space in Section I, the average price was $1.93 per square foot, when the gross sales were 243 square feet and the net sales were 43 square feet, resulting in a net price of $8.64 for the space actually sold.

The profit and loss entries from 1881 to 1913 inclusive showed an average net income of $58,056.94 a year and that such income was never less than $40,000 a year from 1887, but that after reaching a high of $85,000 in 1892 it began a gradual decline and for each of the years from 1909 through 1913 was below the average for the period from 1881 through 1913. Cash dividends were paid from 1884 to 1913, amounting to $30,000 in 1890, $40,000 in three other subsequent years, and in the remaining years ranged from $45,000 to $55,000.

The Board stated that Oak Woods had 2,453,916.78 square feet of salable burial space, for which there was a limited demand; that considering the space sold during the period from 1865 to March 1, 1913, about thirty-five years more would have been required within which to dispose of all the salable land; that on the basis of sales during the five-year period preceding 1913, about fifty-five years in addition would have been required.

It also found that applying the lowest value stated by Oak Woods' witnesses to the salable footage, results in an aggregate value of $3,926,268.85; that Oak Woods' annual return on its perpetual care fund investments amounts to between 5 and 6 percent. Dropping to 4 percent as a return on safe investments, an investor's annual income would have been $157,050.75. In no year was Oak Woods' annual net income from all sources ever comparable to that amount.

*Evergreen Cemetery Association.* This taxpayer, also an Illinois corporation, was organized on June 13, 1910, for the purpose of conducting a cemetery. It acquired from one of its directors a tract of 127.85 acres of land having an appraised value of $800 an acre. The land was situated in the village of Evergreen Park. Sometime between March 1, 1913 and 1918 Evergreen acquired an additional eighty acres of land north of its original tract at a cost of $400 an acre. No part of it is in controversy here.

On March 1, 1913, the cemetery was accessible by means of a steam railroad and a bus connecting it with a Chicago street car line. At that time there were twenty-two cemeteries within the city limits of Chicago, and immediately outside of Chicago there were about twenty-five other cemeteries.

The record does not disclose definitely what improvements had been made on the original tract between 1910 and 1913, nor the cost thereof, but on March 1, 1913, roads had been laid and trees and shrubbery planted. The cost of improvements from March 1, 1913, to December 31, 1928 averaged 5¢ to 12¢ per square foot, depending upon the section of the cemetery. In 1910 the tract had been platted into seven blocks. As late as 1918 only blocks 1 and 2 had been improved sufficiently to make sales for burial space.

The first interment was in July, 1910, and by the end of 1910 twenty-one interments had been made, 383 by March 1, 1913,

7,184 by the end of 1927, and 7,661 by the end of December 1928.

On and prior to March 1, 1913, Evergreen was selling space by single graves and by lots, employing salesmen for that purpose. The sale price included perpetual care and after 1916 it set up on its books a reserve for perpetual care as lot sales for prior years. From July, 1910, to March 1, 1913, it sold 102,602 square feet and the average sales price ranged from 55¢ for 47,000 square feet to 68¢ for less than 1,900 square feet.

St. Mary's Cemetery, established in 1888, adjoins Evergreen on the west. The average sale price of lots in that cemetery from March 1, 1912, to March 1, 1913, was 58¢ per square foot.

After 1920 Evergreen had an income from other sources other than the sale of burial space, but only in two years between 1917 and 1928 was its net income in excess of $10,000. In three years in that period it had a loss. No dividends were paid prior to 1920, but dividends in excess of $12,000 were paid each year thereafter to 1928. In its capital stock returns for the years 1916 through 1926 it valued its unsold land for capital stock purposes at amounts ranging from $111,648.10 to $189,896.82. During the years 1918 to 1920 it made revaluations of its improved land, reducing it by more than $300,000 under the value at which it was placed upon its books at the time of organization, so as to reflect what was considered to be its fair value.

The question calling for a solution is whether the findings of the Board as to the fair market value as of March 1, 1913, of the cemetery lots in 1927, 1928, 1931, and 1932 are supported by substantial evidence.

In these cases counsel for Oak Woods and Evergreen contend that all of the substantial evidence supports a much greater value than that found by the Board, and that the Board applied an incorrect rule of law to the evidentiary facts found.

The determination of value involves a question of discretion, calling for sound and reasonable judgment, having as its basis due and proper consideration of all relevant facts and circumstances, that is to say, all factors having any pertinence or significance as an indication of value must be considered. In considering that question the Board cannot arbitrarily ignore or discredit any of the testimony offered and base its conclusions upon conjecture, but it must consider and weigh all the evidence developed in the case. The principles of law above enunciated have been fully discussed in a number of cases involving very similar facts.[2] These cases are authority for the proposition that the duty to render the determination devolves upon the Board, and that such determination is binding upon this court if supported by substantial evidence.

The applicable statute, § 113(b) of the Revenue Act of 1928, c. 852, 45 Stat. 791, 26 U.S.C.A.Int.Rev.Acts, page 380, provides that the basis to be used in the determination of gain or loss from the sale of property acquired before March 1, 1913, shall be the cost of the property or fair market value at that date, whichever is greater.

Ordinarily cost is the basis for the determination of gain or loss. However, the statute says if one owns property on March 1, 1913, which has a value greater than cost, value may be used as the basis, but only the reasonable and fair increment will be considered. Usually in the case of the determination of what this increment is, the property to be valued is such as is susceptible of immediate sale in a ready market. In determining the fair market value of unsold lots in a cemetery, there are many factors to be considered, and the inquiry should be as broad as possible and all the factors properly evaluated.

In the Oak Woods case the evidence contained actual sales of similar property, on or about the basic date, and opinion testimony of values by experts. They gave a value of $1.60 to $2 per square foot.

The Evergreen case also contained evidence of sales of similar property and opinion testimony giving a value of 56 cents per square foot.

It is upon this state of the records that Oak Woods and Evergreen contend that the Board erred in its determination, citing Fairmount Cemetery Association v. Helvering, 65 App.D.C. 38, 79 F.2d 163, and Id., 67 App.D.C. 345, 92 F.2d 496, West

2 Boggs & Buhl v. Commissioner, 3 Cir., 34 F.2d 859; Foster v. Commissioner, 5 Cir., 57 F.2d 516; Foss et al. v. Commissioner, 1 Cir., 75 F.2d 326; Palmer v. Commissioner, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50; Helvering v. National Grocery Co., 304 U.S. 282, 58 S. Ct. 932, 82 L.Ed. 1346.

View Cemetery Association v. Commissioner, 5 Cir., 95 F.2d 714 and Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37, 57 S.Ct. 324, 81 L.Ed. 491.

Recently in Montrose Cemetery Co. v. Commissioner, 7 Cir., 105 F.2d 238, in which the facts and the contention made were very much like those in the instant cases except as to detail, after stating that retail sales constitute only one element to be taken into consideration in the determination of the fair market value of cemetery land, and that the use of the retail method alone is not justified but that there should be taken into consideration the cost of acquisition of the cemetery, the location, age, size, the state of development, the existence of competing cemeteries, the type of clientele, the trend of population served, annual net earnings, the element of time required to sell the cemetery lots, the present-value method which is based thereon, the topography and other related matters are proper to be considered, we said, page 244: "In essence, the Board * * * considered all the evidence submitted and all the methods of valuation advocated by the witnesses, and then commented on this evidence and on the methods used. If its decision means anything, it means that the Board weighed all the evidence, and that it viewed the methods of valuation used by the witnesses as guides or checks on its judgment and discretion, in determining the fair market value on March 1, 1913."

The Supreme Court in a per curiam opinion on February 5, 1940, Montrose Cemetery Co. v. Commissioner, 60 S.Ct. 511, 84 L.Ed. ——, affirmed the Montrose case, supra, stating: "As it appears that the Board of Tax Appeals received and considered the evidence pertinent to the question of the valuation of the cemetery lots on March 1, 1913, we find no ground for disturbing its ruling."

■ As in the Montrose case, supra, the Board in our cases received and considered the evidence pertinent to the value of the lots and set out its findings of fact in elaborate detail, and in its opinion said it reached its findings of value after weighing and considering all the evidence before it. Under such circumstances the conclusions of the Board must be accepted, Helvering v. Rankin, 295 U.S. 123, 55 S.Ct. 732, 79 L.Ed. 1343.

■ One other matter requires discussion. Counsel for Evergreen raises the point that the Commissioner's valuation was determined solely by the use of a discount theory known as Hoskold's formula, and that the Board adopted the same method. It is true that the Commissioner applied a mathematical formula because he considered that the time element was a necessary factor to take into consideration in determining the value of unsold burial lots. It is also true that the Board held that the evidence of square footage sales price could not be accepted as conclusive evidence. The record here discloses that on March 1, 1913, Evergreen would have had to wait many years to realize the sales price on the burial space then unsold. It also showed that other factors bore upon the value of the unsold space. We are of the opinion that these other factors could not be ignored and that the Commissioner can urge any matter appearing in the record in support of his determination. LeTulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. ——.

■ The ultimate question before us upon the facts as they appear in this record is whether the Board erred in affirming the Commissioner's determination as to values. Helvering v. Gowran, 302 U.S. 238, 246, 58 S.Ct. 154, 82 L.Ed. 224. In our case the determination of the Commissioner was made by considering the elements which the Board recognized as necessary, and the Board, after giving full consideration to all of the evidence, decided it was unable to hold that the Commissioner erred in not determining greater values on the valuation date.

We conclude, therefore, since the records in these cases clearly show that the Board considered all the evidence before it and as its findings of value are supported by substantial evidence, the decisions must be affirmed.

Affirmed.