JAIME y FEDERICO CALAF COLLAZO, peticionarios, *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado; TESORERO DE PUERTO RICO, interventor.

Núm. 268.—*Sometido:* Agosto 26, 1952.   *Resuelto:* Septiembre 22, 1952.

*Diego Guerrero Noble,* abogado de los peticionarios; *Hon. Procurador General Víctor Gutiérrez Franqui* y *José A. García*

*Malpica, Procurador General Auxiliar,* abogados del interventor, querellado en el pleito principal.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tribunal.

El único error imputado por los peticionarios al tribunal recurrido es "resolver que para los años de 1940, 1941, 1942 y 1943([1]) Jaime y Federico Calaf Collazo aunque tenían constituída una Comunidad de Bienes, hacían negocios como una empresa común para fines de lucro, a pesar de que los hechos que consideró probados el propio tribunal, claramente determinaban como conclusión de derecho que los peticionarios eran una comunidad de bienes y como tal venían obligados a tributar únicamente como individuos a los fines de la ley de contribución sobre ingresos."

Después de agotar la vía administrativa, los peticionarios acudieron ante el extinto Tribunal de Contribuciones de Puerto Rico con una querella en la que, según fué enmendada, alegaron en lo aquí esencial que cada uno de ellos rindió oportunamente declaraciones individuales de ingresos para los años naturales terminados en 31 de diciembre de 1938, 1939, 1940, 1941, 1942 y 1943; que investigadas esas declaraciones, el querellado, además de notificarles deficiencias personales, preparó de oficio planillas de sociedad a nombre de Jaime y Federico Calaf Collazo (Central Monserrate) por los mismos años, imponiéndoles a la vez una penalidad de un 25 por ciento sobre el monto de la contribución para los años 1938, 1939, 1942 y 1943, por no haber ellos rendido planillas como sociedad para esos años.([2])

En la vista celebrada ante el Tribunal de Contribuciones las partes adujeron abundante prueba documental y testifical y en 30 de enero del pasado año dicho tribunal dictó sentencia, fundada en extensa opinión, declarando con lugar la

([1]) De los autos se desprende que durante los años 1940 y 1941 el Tesorero determinó una pérdida.

([2]) Las demás partidas mencionadas en la querella enmendada no son objeto del presente recurso por haber sido abandonadas o resueltas favorablemente a los peticionarios.

demanda en cuanto a los años 1938 y 1939, por no constituir los demandantes (aquí peticionarios) durante dichos años una sociedad ni una asociación tributable en relación con su negocio en común de Central Monserrate; y sin lugar en cuanto a los años comprendidos a partir del primero de enero de 1940, por aparecer que ellos estuvieron dedicados después de esa fecha, en relación con la Central Monserrate, a una empresa común para fines de lucro. Los hechos hallados probados por el tribunal fueron los siguientes:

"(1) En virtud de arrendamiento efectuado en el año 1923, Jaime y Federico Calaf operaron y explotaron la Central Monserrate y sus tierras dividiéndose las ganancias y las pérdidas por partes iguales.

"(2) El anterior arrendamiento terminó en el año 1924 con la muerte del arrendador, padre de los arrendatarios y hasta entonces dueño de la propiedad arrendada.

"(3) A partir de noviembre de 1924 Jaime y Federico Calaf vinieron a ser dueños por herencia, en común proindiviso y por partes iguales de la Central Monserrate y sus tierras, unas 5,224 cuerdas, propiedad que siguieron operando y explotando en esa forma hasta el año 1943 en que se terminó la indivisión.

"(4) Jaime y Federico Calaf operaron y explotaron la Central Monserrate y sus tierras durante dicho período en cumplimiento de la voluntad de su padre según fué expresada en su testamento, sin que formalizaran convenio o documento alguno, y sin que terceras personas entraran al negocio.

"(5) A pesar de la voluntad testamentaria sobre la indivisión, cualquiera de los demandantes estaba en libertad de haberlo así deseado, de disponer de su parte de los bienes, o de dejar de operar y explotar la Central Monserrate, cuyo negocio no tenía término fijo de duración.

"(6) Todas las operaciones necesarias en relación con el negocio de la Central Monserrate y sus tierras eran hechas por o a nombre de Jaime y Federico Calaf y sus respectivas sociedades de gananciales, y todas las garantías, hipotecas y gravámenes que se constituyeron para la operación del negocio se efectuaron directamente por o a nombre de Jaime y Federico Calaf, respondiendo mancomunada y solidariamente de tales hipotecas, gravámenes y garantías junto con bienes en común, bienes no heredados privativos y bienes gananciales.

"(7) Para el año 1940 los demandantes dedicaron a la explotación del negocio junto con los bienes heredados, unas 1,412 cuerdas adicionales que adquirieron en común proindiviso por compra y por dación en pago, y dedicaron también fincas no heredadas privativas de Jaime Calaf.

"(8) Para el año 1940 los demandantes molían en la Central Monserrate aproximadamente 16,359 toneladas de caña y producían unas 1,799 toneladas de azúcar pertenecientes a colonos en exceso de las cañas molidas y el azúcar elaborado de sus propias fincas, heredadas y adquiridas.

"(9) Los demandantes modernizaron sustancialmente la Central invirtiendo fuertes sumas de dinero para evitar que la fase fabril del negocio continuara dejando pérdida.

"(10) Entre 1940 y 1943 el negocio se operó y se explotó en la misma forma en que se había operado y explotado desde la muerte del causante hasta 1940, aunque a partir de 1940 todas las transacciones que hay en autos relacionadas con la explotación y operación del negocio fueron hechas por Francisco A. López Domínguez, Administrador General de la Central, a nombre y en representación de cada uno de los demandantes y sus esposas.

"(11) En 1943 y como consecuencia de la política agraria de El Pueblo de Puerto Rico relacionada con la tenencia de tierras los hermanos Jaime y Federico Calaf dividieron la comunidad.

"..   .   .   .   .   .   .   ."

Además, en sus conclusiones de derecho manifestó:

"Es cierto que ellos, según hemos concluído como cuestión de hecho, expresamente no formalizaron un convenio o acuerdo entre sí para operar una empresa común. Pero dicho acuerdo o convenio surge tácita o implícitamente del hecho de que no obstante ocurrir que a partir del 1ro. de enero de 1940 la ley tributó como tal toda empresa común con fines de lucro, ellos siguieron dedicados a la explotación en común del negocio de Central Monserrate, y no disolvieron la comunidad ni terminaron el negocio, ni separaron sus bienes como lo hicieron años más tarde cuando por razón de la política agraria de la Autoridad de Tierras creyeron conveniente cesar en dicha explotación común."

██ La sección 2(a)3 de la Ley de Contribuciones Sobre Ingresos (Núm. 74 de 1925, (pág. 401)) según quedó en-

mendada por la Ley núm. 31 de 12 de abril de 1941 ( (1) pág. 479), dispone en lo aquí pertinente que: "El término 'sociedad' incluirá las sociedades civiles, mercantiles, industriales, agrícolas, profesionales o de cualquiera otra índoles, conste o no, su constitución en escritura pública o documento privado e incluirá, además, cuando dos o más personas bajo un nombre común o no se dediquen a una empresa común (*joint ventures*), con fines de lucro."

Interpretando esa sección dijimos en *Puig* v. *Tribunal de Contribuciones*, 65 D.P.R. 734, 739, que: "Está bien establecido que la mera comunidad de bienes no constituye una empresa común para fines de lucro. (Citas.) Para que la constituya es preciso que sin formarse una verdadera sociedad, los dueños de los condominios los aporten para dedicarse, con fines de lucro, a una determinada operación; que participen todos en las pérdidas y ganancias;..." Como esas condiciones no concurrían en dicho caso, resolvimos el mismo a favor de la recurrente.

Más tarde en *Vías* v. *Tribunal de Contribuciones*, 67 D.P.R. 491, 494, repetimos el principio ya expuesto y concluímos, asimismo, que los componentes de la sucesión, quienes habían heredado de su padre en el año 1938 una finca rústica y otra urbana y un condominio en la mitad de otra casa tampoco constituían una empresa común con fines de lucro, debido a que la gestión de cada uno de los condóminos se reducía a percibir el aprovechamiento de su propiedad, es decir, el canon de arrendamiento de sus respectivos condominios.

Empero, en el de *Tesorero* v. *Tribunal de Contribuciones y Comunidad Fajardo*, 70 D.P.R. 99, en el cual los hechos guardan cierta similitud con los del presente, resolvimos que la comunidad allí envuelta constituía una sociedad para fines contributivos a partir del año 1940 en adelante. Hicimos en ese caso una extensa relación de los hechos envueltos y después de citar los de *Puig* y *Vías*, supra, al igual que el

de *Buscaglia, Tes.* v. *Tribunal de Contribuciones, Sucn. Fernández González, Interventora*, resuelto con opinión *Per Curiam* el 12 de abril de 1946, manifestamos que: "Los hechos del presente caso difieren grandemente de aquéllos que dieron lugar a nuestras decisiones en los tres casos que acabamos de citar. Si bien, como hemos resuelto antes, los partícipes de la comunidad no constituían una sociedad bajo el artículo 2 (*a*) 3 antes de ser enmendado por la Ley núm. 31 de 1941, sí constituyen, a nuestro juicio, una empresa común con fines de lucro bajo dicho artículo enmendado. . . Además de los hechos que el tribunal inferior consideró probados existen otros, los cuales no mencionó en su resolución y que demuestran que los partícipes en la comunidad aportaron sus condominios a la empresa común de explotarlos en la siembra y cultivo de cañas de azúcar... Estos hechos demuestran que los partícipes en la comunidad de bienes en este caso no se han limitado, como en los casos antes citados, a arrendar sus condominios y a percibir sus rentas, sino más bien que están llevando a cabo el negocio de explotar las fincas poseídas en común, con fines de lucro, por un determinado número de años." Véase también *Tesorero* v. *Tribunal de Contribuciones y Fraticelli, etc.*, 70 D.P.R. 475.

La transcripción de evidencia en este caso sostiene plenamente las conclusiones de hechos del tribunal inferior. Hemos visto por éstas que allá para el año 1923 los peticionarios explotaban la Central Monserrate en concepto de arrendatarios; que el arrendamiento terminó al siguiente año al morir el padre de ellos y que desde entonces siguieron siendo dueños por herencia, en común proindiviso y por partes iguales, de la referida Central y sus tierras; que a pesar de la voluntad testamentaria sobre la indivisión, cualquiera de los peticionarios estaba en libertad de terminar la comunidad; que todas las operaciones necesarias en relación con el negocio de la Central y sus tierras eran hechas a nombre de ellos y de sus respectivas esposas; que para el año 1940 dedicaron, a la

explotación del negocio, junto con los bienes heredados, 1412 cuerdas adicionales de terreno que adquirieron en común proindiviso por compra y dación en pago, así como fincas privativas del peticionario Jaime Calaf; que en adición a las cañas de azúcar producidas por los propios terrenos por ellos poseídos, en la Central Monserrate se molieron en el año 1940 16,359 toneladas de caña perteneciente a colonos; que a partir de 1940 todas las transacciones relacionadas con el negocio fueron hechas por su Administrador General, a nombre y en representación de cada uno de los peticionarios y sus respectivas esposas; y que en 1943 los peticionarios dividieron la comunidad que hasta entonces tenían constituída.

La prueba demuestra, además, que las ganancias y pérdidas con motivo de la explotación de la Central eran disfrutadas o sufridas de por mitad por los peticionarios y que el propósito fundamental de ellos al dedicarse a ese negocio era no sólo dar cumplimiento a los deseos expresados por su finado padre, sino también obtener ganancias pecuniarias. La mera existencia de una comunidad de bienes no constituye una sociedad a los fines de la sección 2 (a) 3, mas si esa comunidad se dedica a un negocio común para beneficio mutuo de los condóminos, queda claramente constituída una sociedad a los fines de la citada sección. En el presente caso no hay lugar a dudas de que los requisitos exigidos por la jurisprudencia a ese respecto han quedado cumplidos.

La situación envuelta en los casos de *Puig*, *Vías* y *Sucn. Fernández González*, ya citados, es completamente distinta a la del presente, ya que aquí la gestión de cada uno de los peticionarios no se limitó a percibir los beneficios correspondientes a sus respectivas aportaciones, como sucedió en aquéllos, sino que ambos tenían voz y voto en la administración de los bienes de la comunidad y cada uno actuaba como mandatario del otro en lo que se refería a las gestiones que realizaban. La relación fiduciaria necesaria a la existencia de

una empresa común (*joint venture*) existió, incuestionable-
mente, para los años aquí envueltos.

*Debe confirmarse la sentencia apelada.*

El Juez Presidente Señor Todd, Jr., no intervino.

El Juez Asociado Señor Negrón Fernández se inhibió.