98

SUCESIÓN DE JOSÉ CASTILLO MERCADO, ETC., demandante y apelante, *v.* SOL LUIS DESCARTES, SECRETARIO DE HACIENDA DE PUERTO RICO, demandado y apelado.

Número 12075.

*Sometido:* 5 de junio de 1961. *Resuelto:* 27 de junio de 1961.

*Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella* y *C. Morales, Jr.*, abogados de los apelantes; *J. B. Fernández Badillo, Secretario de Justicia, Arturo Estrella, Secretario de Justicia Auxiliar* y *José A. García Malpica, Procurador Auxiliar,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

En 24 de junio de 1953 el Secretario de Hacienda notificó a Sucn. José A. Castillo (Sociedad) deficiencias sobre ingresos para los años 1945 a 1946, ambos inclusive, montante en total a la suma de $7,135.55.

La Sucesión de José A. Castillo Mercado, representada por su Apoderado y Albacea Testamentario, el señor José A. Castillo impugnó dichas deficiencias ante el Tribunal Superior. Después de radicadas las alegaciones correspondientes por ambas partes, se celebró un juicio en los méritos luego de lo cual dicho tribunal dictó sentencia declarando sin lugar la demanda.

El tribunal sentenciador formuló, en lo pertinente, las siguientes conclusiones de hecho:

Por escritura pública de 25 de mayo de 1944, los esposos José Castillo Mercado y Margarita Pietri concedieron a su hijo José Antonio Castillo Pietri un poder general, nombrán-

dolo mandatario para que custodiara, protegiera y administrara todos los bienes, privativos y gananciales de los mandantes conforme a lo dispuesto en los artículos 1600 a 1630 del Código Civil. Anteriormente y por espacio de más de un año, José A. Castillo Pietri, había tenido a su cargo la administración de todos dichos bienes, los que se describieron en la escritura de poder como fincas agrícolas y urbanas propiedad de los mandantes, fincas agrícolas poseídas por éstos en arrendamiento, utensilios agrícolas, ganado, cosechas, tanto en proceso de cultivo como las almacenadas o existentes en cualquier forma, fondos, ya fueran éstos en documentos negociables o en efectivo. Los bienes privativos de la esposa consistían en casas de alquiler y su propia residencia con un anexo.

En virtud de dicho poder el Administrador quedó facultado para emplear los referidos fondos en los gastos de funcionamiento o explotación de los negocios de los mandantes; en el pago de las obligaciones; en la adquisición y venta de bienes muebles e inmuebles de todas clases. También quedó facultado para comparecer y actuar a nombre y representación de los mandantes, separada o conjuntamente, en toda clase de gestiones y contratos, en escrituras públicas o en cualquier otra forma. Se designó una compensación de $2,000 anuales.

Castillo Pietri administró en esa forma los bienes de los esposos Castillo Pietri hasta el día 13 de abril de 1945, fecha en que falleció su padre, José Castillo Mercado.

Sucedieron a éste su viuda Margarita Pietri y sus hijos Juana Josefa, José Antonio, Julio Carlos, Carmen, Margarita, María Nicanor, Laura Cecilia, Esperanza y César Castillo Pietri. Por disposición testamentaria José Castillo Mercado instituyó a sus nueve hijos herederos en dos terceras partes de sus bienes y a su esposa en la otra tercera parte en lugar de su cuota vidual.

Dos días después de fallecido José Castillo Mercado, o sea, en 15 de abril de 1945, su viuda y sus hijos firmaron un documento haciendo constar que con el propósito de impedir que se paralizaran las operaciones más urgentes de los negocios en la administración de los bienes de don José Castillo y doña Margarita Pietri, designaban a José Antonio Castillo Pietri para que continuara administrando temporalmente dichos bienes. Se le autorizó además para que gestionara con el Banco Caja de Economías y Préstamos de San Germán, depositario de los fondos de José Castillo Mercado y Margarita Pietri, el cambio de la cuenta para que se mantenga a nombre de Margarita Pietri González y Sucesión de don José Castillo Mercado. Se autorizó al administrador provisional para que utilizara dichos fondos en la forma que hasta entonces los venía utilizando de acuerdo con la escritura de poder y para que firmara los cheques que expidiera.

Por escritura pública de 18 de septiembre de 1945, la viuda y los hijos del causante concedieron poder al mismo José A. Castillo Pietri para que administrara los bienes y negocios de la Sucesión y de doña Margarita Pietri con las mismas facultades y en las mismas condiciones fijadas en la escritura de poder general de 25 de mayo de 1944 y hasta que se realizara la partición y división de los bienes. Por otra escritura de 31 de marzo de 1948, prorrogaron el término del poder. En septiembre 13 de 1949 otorgaron una escritura concediéndole facultad expresa a José A. Castillo Pietri para tomar dinero a préstamo y para emitir pagarés y certificados de deuda, pudiendo, al indicado efecto, garantizar las obligaciones con los bienes, valores o derechos de los mandantes.

En el año 1949, la viuda sufrió un serio quebranto en su salud que requirió atención especial de médicos y enfermeras y como consecuencia quedó físicamente incapacitada desde 1950. Los ingresos derivados por ella de sus bienes priva-

tivos y hereditarios resultaron insuficientes para cubrir sus gastos corrientes y los extraordinarios incurridos con motivo de su enfermedad. Desde 1945 y hasta 1952, el exceso de sus egresos sobre los ingresos era de $39,064.45.

En febrero de 1953 los hijos de doña Margarita, con excepción de Virginia, celebraron una reunión de familia en la cual el apoderado y administrador informó sobre su gestión desde 1945. Se acordó en dicha reunión autorizar al Administrador a tomar prestada la suma de $50,000 y a garantizar el préstamo con hipotecas sobre las fincas de la Sucesión. Este dinero se invertiría en el pago de las deudas más urgentes de la Sucesión, la que asumió la responsabilidad de satisfacer casi la totalidad de los gastos en que había incurrido la viuda desde 1945 a 1952. También se acordó en dicha reunión no proceder a la partición de bienes y que José A. Castillo Pietri continuara en la administración mientras viviere la viuda Margarita Pietri.

Las contribuciones adeudadas por la viuda y la Sucn. se pagaban con cheques girados contra los fondos de la Sucesión los cuales provenían de los beneficios obtenidos en las fincas de caña, pastos y frutos menores y rentas de las casas de alquiler. Todos los demás gastos se cubrían con estos fondos. La Sucesión se dedicaba además a la venta de leche y ganado, al pastoreo de reses por una cantidad mensual por cabeza, y a la extracción y venta de piedra.

De 1946 a 1949 se hicieron los siguientes cambios o reformas en las propiedades: una parte de la residencia de la viuda se empezó a usar como oficina del Administrador; se mejoró dicha residencia a un costo de $3,000; se invirtió $1,000 en la reconstrucción de un "ranchón" en una de las fincas y en otra se construyó un tanque de inmersión para ganado a un costo de $500.

Las distintas participaciones de los coherederos en los beneficios derivados de los bienes y negocios no fueron distribuidas oportunamente. No obstante, lo que correspondía

a cada uno, y habría de ser entregado si no se hubiera gastado, fue anotado en los libros que llevaba el Administrador.

■ Como primer error señalan los recurrentes que el tribunal sentenciador carecía de jurisdicción para considerar el caso en sus méritos. Fundan este planteamiento en la ausencia de una notificación válida y legal de deficiencia contributiva. En apoyo de su contención alegan que la notificación de deficiencias fue efectuada a nombre de "Sucesión José Castillo Mercado (Sociedad)" y que como la sucesión no tiene personalidad jurídica y tampoco existe registrada sociedad alguna de nombre José Castillo Mercado no se ha efectuado una notificación de deficiencia contributiva al verdadero contribuyente, o sea, a todos y cada uno de los herederos del causante José Castillo Mercado, quienes componían su sucesión, y su viuda Margarita Pietri.

El error no fue cometido. Sin necesidad de entrar a considerar otros fundamentos legales para desestimar el error señalado, bastará decir que los recurrentes, tomando como base la notificación que ahora impugnan ante nos, se acogieron a la revisión administrativa que la ley concede y luego recurrieron al Tribunal Superior e invocaron su jurisdicción con el propósito de obtener una decisión judicial en el sentido de que los componentes de la Sucesión de don José Castillo Mercado y la viuda de éste, no eran a los fines de la Ley de Contribuciones sobre Ingresos, una sociedad (*joint venture*) durante los años cubiertos por las deficiencias notificadas. Una cuestión similar la resolvimos en contra de los recurrentes en el caso de *Sucn. Marcial Suárez et al* v. *Secretario De Hacienda*, 82 D.P.R. 321.

■ Los errores segundo y tercero lo señalan los recurrentes así:

"Segundo Error: Aun asumiendo que el tribunal tuviera jurisdicción para resolver en los méritos este caso, erró al asumir que la ley aplicable lo eran las disposiciones de la Ley de Contribuciones sobre Ingresos sobre empresa común y no las de sucesión.

"Tercer Error: Aun asumiendo que exista jurisdicción para resolver en sus méritos este caso y aun asumiendo que sean aplicables en este caso las disposiciones relativas a empresa común, erró el tribunal al determinar que en este caso existía una relación fiduciaria y una aportación de capital y bienes de parte de los herederos a una empresa común."

Por estar íntimamente relacionados, discutiremos conjuntamente ambos errores.

La cuestión principal a decidir en este recurso es si de acuerdo con los hechos probados la Sucesión de José Castillo Mercado y la viuda de éste constituyen como cuestión de derecho una empresa común (*joint venture*) a los fines de la Ley de Contribuciones sobre Ingresos.

La ley aplicable es la sección 2 (*a*) (3) de la Ley de Contribuciones sobre Ingresos de 1925, según fue enmendada por la Ley Núm. 31 de 12 de abril de 1941. (13 L.P.R.A., sección 632.) En lo pertinente dispone dicha sección: "(3) El término 'sociedad' incluirá las sociedades civiles, . . . e incluirá, además, cuando dos o más personas bajo un nombre común o no se dediquen a una empresa común con fines de lucro."

La citada ley incluye en el término "sociedad" a "la empresa común con fines de lucro". Aunque no define este último concepto, la jurisprudencia, distinguiéndola de la mera comunidad de bienes, ha señalado las circunstancias que deben concurrir para que surja la "empresa común con fines de lucro". "Para que la constituya es preciso que sin formarse una verdadera sociedad, los dueños de los condominios los aporten para dedicarse, con fines de lucro, a una determinada operación; que participen todos en las pérdidas y ganancias; que haya entre ellos la relación fiduciaria que existe entre los socios, de suerte que cada uno sea mandatario de los demás en lo que respecta a cualquier gestión comprendida dentro del ámbito de la empresa común, teniendo así cada uno voz y voto en su administración, si bien pueden convenir que uno o más de ellos asuman la gestión del nego-

cio en representación de los demás, tal y como sucede con las sociedades." *Puig* v. *Tribunal de Contribuciones*, 65 D.P.R. 734, 739; *Vías* v. *Tribl. de Contribuciones*, 67 D.P.R. 491. En estos dos casos resolvimos que como los partícipes en la comunidad de bienes se habían limitado a arrendar sus condominios y percibir sus rentas, no constituían una empresa común con fines de lucro. En cambio, en *Tesorero* v. *Tribunal de Contribuciones y Comunidad Fajardo*, 70 D.P.R. 99 y *Calaf* v. *Tribunal*, 73 D.P.R. 812, resolvimos que los condómines se habían dedicado a una empresa común con fines de lucro, basándonos en los requisitos establecidos en *Puig* v. *Tribunal*, supra.

En el caso de *Calaf*, dos hermanos, Jaime y Federico Calaf, adquirieron por herencia en 1924, en común proindiviso y por partes iguales, la Central Monserrate y sus tierras, propiedad que siguieron operando y explotando en esa forma, por voluntad testamentaria de su padre, hasta el año 1943 en que terminó la indivisión. Las operaciones necesarias en relación con el negocio de la Central Monserrate y sus tierras eran hechas por y a nombre de ambos hermanos Calaf y sus respectivas sociedades de gananciales y todas las garantías, hipotecas y gravámenes que se constituyeron para la operación del negocio se efectuaron por o a nombre de dichos hermanos, respondiendo mancomunada y solidariamente de dichos gravámenes y garantías, junto con sus bienes en común, bienes no heredados, privativos y bienes gananciales. En la explotación de dicho negocio dedicaron tierras adicionales adquiridas por compra en común proindiviso y además otras fincas privativas de uno de los hermanos. Para el año 1940 molían cañas de otros colonos y modernizaron sustancialmente la central invirtiendo en ello fuertes sumas de dinero. Entre 1940 y 1943 el negocio se operó y se explotó en la misma forma en que se había operado y explotado desde la muerte del causante hasta 1940, aunque a partir de este año las transacciones relacionadas con la explotación y operación

del negocio fueron hechas por el Administrador General de la Central, a nombre y en representación de cada uno de los hermanos y sus esposas.

■ Alegan los recurrentes que en este caso no hubo aportación voluntaria de condominios ni se estableció la existencia de una relación fiduciaria entre los condómines. Su contención principal es que ellos se vieron obligados a permanecer en la comunidad porque el Secretario de Hacienda no había tasado los bienes hereditarios ni les había notificado la contribución sobre herencia, razón por la cual estaban impedidos de practicar la división.

Independientemente del valor jurídico que pueda tener este argumento, resulta evidente de los autos, que además de los bienes hereditarios de la sucesión, se aportaron a la empresa los bienes gananciales y los privativos de la viuda Doña Margarita Pietri. Todos dichos bienes formaban una masa común dedicada a la explotación de los distintos negocios a que ya hemos hecho referencia. Existía una sola cuenta bancaria y el hijo mayor tenía poder, concedido por todos los miembros de la sucesión, para administrar y explotar dichos bienes. En los libros aparecían las cuentas de cada uno de ellos, incluyendo los beneficios que les correspondían en proporción a sus respectivas aportaciones.(1)   Si

---

(1) Don José A. Castillo declaró lo siguiente:

"P.—Testigo, en relación con esta declaración de deficiencia, al rendir la declaración de cada año de doña Margarita, ¿se hicieron remesas con las planillas?

"R.—Sí, señor.

"P.—Y, ¿se acompañó los cheques correspondientes?

"R.—Sí, señor.

"P.—¿Por quién?

"R.—Por la sucesión.

"P.—¿Para pagar las contribuciones de doña Margarita?

"R.—Sí, señor.

"P.—¿Por qué no se hicieron cheques de doña Margarita y se hicieron de la sucesión?

"R.—Porque la cuenta está toda a nombre de la sucesión en el banco.

"P.—¿Es una sola cuenta?

"R.—Sí, señor.

bien dichos beneficios no se distribuyeron ello se debió a que los herederos dispusieron que sus créditos se aplicarían a enjugar parte del déficit en la cuenta de la viuda. El testigo José A. Castillo declaró que por razones sentimentales los miembros de la Sucesión habían tomado el acuerdo de no disponer, en forma alguna, de los bienes que estaban bajo su administración mientras viviera la viuda.

Es difícil sostener que no hubo aportación voluntaria de condominios cuando ocurre, como en este caso, que los bienes de la Sucesión, poseídos en común y proindiviso, se unen a

---

"P.—¿Por qué?

"R.—Porque es así. Se trata de una sucesión y de una sola cuenta en el banco.

"P.—Pero, ¿en el cheque se hacía constar que era para pagar la planilla de doña Margarita?

"R.—Sí, señor." (T.E., págs. 79, 80.)

"P.—Y, ¿el producto de la venta de esa leche?

"R.—Iba al fondo común.

"P.—Y, ¿al morir su padre, su señora madre no recibió su participación de gananciales en los bienes?

"R.—No los recibió.

"P.—Debo entender que, al morir su padre, todos los bienes que dejó eran bienes privativos, no bienes gananciales.

"R.—¿De quién?

"P.—De su padre y su madre.

"R.—Mi madre tenía algunos bienes privativos cuando murió mi padre.

"P.—¿Qué ocurrió con eso?

"R.—Eso quedó allí para ella.

"P.—¿Se explotan conjuntamente con los demás bienes de la sucesión?

"R.—Están todos en la misma situación. Están todos juntos. De acuerdo con la disposición testamentaria, aparte de los bienes privativos de ella, está la parte que le corresponde a ella.

"P.—Al morir su padre, ¿la mitad de los bienes que dejaba no le correspondía a su madre en concepto de gananciales?

"R.—Sí, señor.

"P.—Y, ¿qué se hizo con la mitad de su madre?

"R.—Todo eso quedó en común allí.

"P.—Y, los beneficios que producían esos bienes, ¿también iban a parar al fondo común de la sucesión?

"R.—Sí, señor.

"P.—Y, los bienes recibidos por disposición testamentaria por su madre, como heredera de su señor padre, ¿también quedaron en el fondo común? ¿En la explotación común?

"R.—Sí, señor." (T. E. págs. 186, 187.)

los bienes gananciales y a los privativos de la viuda para dedicarlos a la explotación de diversos negocios. A nuestro juicio han quedado establecidas todas las circunstancias señaladas en el caso de *Puig*, supra, para que surja a la vida del derecho contributivo una empresa común (*joint venture*) con fines de lucro. La existencia de la relación fiduciaria entre los componentes de esta empresa común surge con meridiana claridad de los hechos probados. Don José A. Castillo asumió la gestión del negocio en representación de los demás, tal y como sucede en las sociedades, en virtud de un poder general que le otorgaron a ese fin, y que renovaron en repetidas ocasiones.(²)

Forzoso es concluir que no se han cometido estos dos errores.

■ Por el cuarto y último señalamiento se imputa error al tribunal sentenciador al sostener la imposición de la penalidad notificada por el Secretario de Hacienda en la cantidad de un 25% de la deficiencia por el fundamento de que no se había rendido declaración.

Arguyen los recurrentes que si bien es cierto que no rindieron una planilla como "sociedad", se rindió una planilla como "sucesión" en la cual se incluyeron todos los ingresos tributables obtenidos. Citan jurisprudencia para sostener que cuando se ha rendido una planilla de buena fe en la cual se informa el ingreso neto tributable, no procede la penalidad del 25% por el mero hecho de que dicha planilla se ha rendido en forma equivocada.

No nos detendremos a discutir los méritos de este señalamiento de error. Bastará decir que dicha penalidad no fue objeto de impugnación ante el Tribunal Superior. Así lo re-

---

(²) Véase, además del caso de *Puig*, supra, y por vía de ilustración, *Joe Balestrieri & Co.* v. *Commissioner of Internal Revenue*, 177 F.2d 867; *Martter* v. *Byers*, 171 P. 2d 101; *Mazzera* v. *Wolf*, 173 P.2d 44; *Hawkins* v. *Travelers Indem. Co.* (La. App.), 73 So.2d 348; *Sime* v. *Malouf*, 212 P.2d 946, rec. den. 213 P.2d 788; *In re McAnelly's State*, 258 P.2d 741; *James* v. *Atlantic & East Carolina R. Co.*, 65 S.E.2d 214; *Carey* v. *Humphries*, 107 N.W.2d 20.

velan las alegaciones y los incidentes del juicio. No se planteó ni discutió esta cuestión ante el tribunal, ni se le dio una oportunidad a éste para que pasara sobre ella. Es en este recurso ante nos que se suscita el punto por primera vez. En esta forma los recurrentes privaron al recurrido de enfrentarse a la cuestión, como lo creyere conveniente, ante el tribunal de instancia. En su consecuencia, desestimamos dicho señalamiento de error.

*Por las razones expuestas se confirmará la sentencia dictada por el Tribunal Superior.*

El Juez Asociado Sr. Santana Becerra no intervino.