JUAN Y JOSÉ SUÁREZ FUENTES, demandantes y recurridos, *v.* SOL L. DESCARTES, SECRETARIO DE HACIENDA, demandado y recurrente; JUAN SUÁREZ FUENTES, demandante, recurrido y recurrente, *v.* SOL L. DESCARTES, SECRETARIO DE HACIENDA, demandado, recurrente, recurrido.

*Números:* 12257, 12258 y 12259. *Resueltos:* 7 de mayo de 1962

390

*Gutiérrez, Saldaña & Sánchez, Sara Torres Peralta* y *C. Morales, Jr.,* abogados de Juan y José Suárez Fuentes; *J. B. Fernández Badillo, Secretario de Justicia, Arturo Estrella, Secretario Auxiliar,* y *J. C. Santiago Matos, Procurador Auxiliar,* abogados del Secretario de Hacienda.
Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Rigau.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

Se trata de tres recursos bastante relacionados entre sí, sometidos por una prueba conjunta. En el recurso 12,257 —que corresponde al caso R–81 de la anterior Sala de Asuntos Contributivos del Tribunal Superior de Puerto Rico— los recurridos Juan y José Suárez Fuentes, solicitaron el

reintegro total de la cantidad declarada en la planilla de contribución sobre ingresos del año 1948, alegando que por un error, además de incluirlos en sus planillas individuales, declararon dichos ingresos como si entre ambos existiera una sociedad especial o empresa común—*joint venture*—, cuando en realidad de derecho, lo que existía entre ellos era una relación de arrendador y arrendatario. En el recurso 12,258 —que corresponde al caso I–359 de la anterior Sala de Asuntos Contributivos—los recurridos y recurrentes Juan y José Suárez Fuentes, mediante afianzamiento, impugnaron ciertas deficiencias determinadas por el Secretario de Hacienda sobre sus declaraciones de ingreso de los años 1946 y 1947, como si tuvieran establecida entre ellos una sociedad especial o empresa común para la explotación de un edificio de apartamentos conocida como *Ocean Walk Apartments* y en cuanto a los años 1948 y 1949, como si tuvieran establecida dicha sociedad especial o empresa común, no sólo en cuanto a dicho edificio de apartamientos sino también en cuanto a una finca que explotaba José Suárez Fuentes, y en el supuesto, de que fuera correcta la conclusión del Secretario de Hacienda sobre la existencia de la sociedad especial o empresa común, había cometido error el Secretario de Hacienda al determinar los ingresos y deducciones de dicha supuesta sociedad durante los años 1946 y 1947 en cuanto a rentas, reparaciones, seguros, intereses, agua y luz, depreciación y contribuciones durante los años 1948 y 1949; al determinar el ingreso neto, habiendo imputado un volumen de ingresos por concepto de renta mayor del declarado para el año 1946 por los recurridos y recurrentes; al no aceptar gastos incurridos por los demandantes y deducibles bajo la Ley de Contribución Sobre Ingresos para el 1946; al notificar deficiencia en contribución sobre ingresos del 1946 por determinada suma, incluyendo las penalidades de 25% por no rendir la declaración y de 5% por negligencia o ignorancia intencional de la Ley y reglamentos aprobados por el Secretario de Hacienda, ya que los recurridos y recurrentes no vienen obligados a rendir

declaración como tal sociedad; al adicionar una cantidad incorrecta por concepto de rentas del edificio Ocean Walk Apartments en la notificación de deficiencia del 1947; al no aceptar las deducciones para el año 1947 a que tienen derecho los recurridos y recurrentes en exceso de aquellas aceptadas por el Secretario de Hacienda en su notificación de 5 de febrero de 1953, incluyendo deducciones no reclamadas en planilla; al notificar deficiencias en contribución sobre ingresos para el año 1947 por determinada suma incluyendo las penalidades del 25% y el 5%; al incluir como ingreso de la presunta sociedad para el año 1948 los ingresos por concepto de rentas del Edificio Ocean Walk Apartments y los ingresos de agricultura de la finca cultivada por el recurrido y recurrente José Suárez Fuentes; al no aceptar como deducciones al ingreso bruto de 1948, gastos ordinarios y necesarios incurridos en la explotación de la finca y en la explotación del edificio antes mencionado; al notificar una deficiencia en contribución sobre ingresos para el año 1948, incluyendo intereses y penalidades y además la penalidad del 5%; al incluir como ingreso para el 1949 de la susodicha sociedad los ingresos por concepto de renta del edificio y del producto de la finca antes descritas; al no aceptar como deducciones al ingreso bruto de 1949 de la presunta sociedad, gastos ordinarios y necesarios incurridos por los demandantes en la explotación de dichos negocios; al notificar una deficiencia en contribución sobre ingresos para el año 1949, incluyendo intereses y penalidades y además la penalidad del 5%.

En el recurso 12,259—que corresponde al caso I-361 de la anterior Sala de Asuntos Contributivos del Tribunal Superior de Puerto Rico—el recurrido y recurrente José Suárez Fuentes, mediante afianzamiento, impugnó las deficiencias correspondientes a los años 1944, 1946, 1947, 1948 y 1949 notificadas por el Secretario de Hacienda por concepto de ingresos no identificados y no declarados durante el año 1944; al notificar deficiencia en contribución sobre ingresos

·e intereses imponiendo una penalidad del 25% por no haber rendido la declaración correspondiente y, además, al imponer una deficiencia por fraude igual al 50% de la deficiencia de la contribución determinada; al determinar para el año 1947 una deficiencia por beneficios en una sociedad no existente, sin aceptar las deducciones permisibles, no declaradas en planilla, incluyendo una penalidad de un 5% debido a negligencia o ignorancia intencional; al reajustar el año 1948 imputando ingresos no identificados y un beneficio en una presunta sociedad, además imponer una penalidad por negligencia o ignorancia intencional de la Ley y sus reglamentos; al determinar para el año 1949 una deficiencia imputando beneficios en una presunta sociedad e ingresos no identificados e imponiendo una penalidad de 50% por fraude; al no conceder al recurrido recurrente para el año 1949, la exención de $500 a que tiene derecho como veterano y al no concederle deducciones no reclamadas en planilla pero concedidas por la sección 16 de la Ley de Contribución Sobre Ingresos.

Lo que plantea esencialmente este recurso es, si durante los años 1946 al 1949, entre los hermanos Juan y José Suárez, existe una sociedad especial o empresa común para la explotación de un negocio urbano, el edificio de apartamentos conocido por Ocean Walk Apartments, y un negocio agrícola, el grupo de fincas conocido por Herrera. La ilustrada Sala sentenciadora resolvió que, en cuanto al negocio urbano, existía dicha sociedad o empresa, pero no en cuanto al negocio agrícola. De la parte del fallo que declara no existir tal sociedad o empresa en el negocio agrícola, apela el Secretario de Hacienda y de la parte que declara que tal sociedad o empresa existe en cuanto al negocio urbano, apelan los recurridos y recurrentes Juan y José Suárez Fuentes.

Se hace necesario examinar las estructuras contractuales creadas para la explotación de ambos negocios. Por escritura número 10 de 13 de marzo de 1946 ante el Notario Víctor A. Coll. don Jorge Ortiz Toro y su esposa doña Rita

Brunet Calaf, le vendieron a don Juan Suárez Fuentes y su esposa doña Aida Miranda y a don José Suárez Fuentes dos solares, uno de dos mil doscientos setenta metros con siete centímetros cuadrados y otro de novecientos catorce metros con veinte y cinco centímetros cuadrados, con sus correspondientes edificaciones; sobre el primer solar se habían construido dos edificios, el principal de siete plantas, cada planta de dos apartamentos, conocido por el nombre de Ocean Walk Apartments y otro edificio anexo de dos plantas, dedicada la de abajo a garage y la de arriba a viviendas. Sobre el segundo solar se había construido un edificio de una sola planta, destinado a garages. Sobre el primer solar y sus edificaciones se había constituido una hipoteca a favor de la Jefferson Standard Life Insurance Company por la cantidad de noventa y un mil seiscientos veinte dólares. El precio de la venta fue de ciento cuarenta mil dólares, de las cuales se reservaron los compradores la cantidad de noventa y un mil seiscientos veinte dólares para pagar en su día la hipoteca, entregando a los vendedores, en presencia del notario, la cantidad de cuarenta y ocho mil trescientos ochenta dólares.

Por escritura número 3 de 2 de febrero de 1948, don Marcial Suárez y doña Encarnación Fuentes le arrendaron a don Juan Suárez, casado con doña Aida Miranda, un grupo de fincas rústicas por el término de diez años, a contar desde la fecha del otorgamiento hasta igual día y mes del año mil novecientos cincuenta y ocho, por el canon anual de doce mil dólares, más el pago de contribuciones, reducibles a ocho mil dólares anuales en caso de que el precio de los cocos bajara a menos de tres dólares el saco, con derecho del arrendatario o prorrogar dicho arrendamiento por diez años adicionales previo aviso con tres meses de anticipación, debiendo dedicarse las fincas arrendadas a la siembra y cultivo de palmas de coco y quedando las edificaciones o mejoras a favor de los arrendadores.

Por documento privado suscrito el 2 de febrero de 1948 por don Marcial Suárez y doña Encarnación Fuentes de una

parte y don Juan Suárez Fuentes de la otra, protocolizado por la escritura número 7 de 27 de febrero de 1948 ante el Notario Víctor A. Coll, y refiriéndose al arrendamiento anteriormente expuesto, las dos partes hacen constar que "don Juan Suárez Fuentes, en unión de su hermano don José Suárez Fuentes, tienen la *nuda propiedad* de un edificio de apartamientos situado en la Terraza del Parque y conocido como Ocean Walk Apartments"; que "las rentas de este edificio pertenecen a don Marcial Suárez y su esposa doña Encarnación Fuentes"; que "sobre este edificio pesa una hipoteca como parte del precio aplazado"; que "las partes hacen constar que como motivo y causa del arrendamiento de las fincas a que se ha hecho mención, se estipuló y por la presente se confirma, que después de deducidos los gastos de administración de las fincas arrendadas, todo el beneficio que produzcan se usará y dedicará exclusivamente a abonarse a la dicha hipoteca hasta que la misma sea completamente saldada".

Por escritura número 4 de 4 de febrero de 1948 ante el Notario Víctor A. Coll, don Juan Suárez Fuentes y su esposa doña Aida Miranda, dan en subarrendamiento y subarriendan a don José Suárez Fuentes y su esposa doña Celia Cestero, las mismas propiedades que les fueron arrendadas a los primeros por don Marcial Suárez y su esposa doña Encarnación Fuentes, comprometiéndose don José Suárez "a administrar con el cuidado de un buen padre de familia las fincas subarrendadas, cumpliendo con todos los términos del arrendamiento entre Don Marcial y Don Juan Suárez", constituyendo dicha administración, "la causa y consideración del subarriendo", siendo los términos y condiciones de dicha administración los siguientes:

"(a) Don José Suárez recibirá y tendrá derecho a retener de los productos de las fincas administradas la cantidad de seis mil dollars anuales para el pago y atención de sus gastos personales; (b)—Don José Suárez atenderá a las siembras, cultivo y recolección y venta de los frutos, usando a estos fines las medidas que fueren necesarias; (c)—Don

José Suárez queda obligado a llevar las cuentas de la administración en libros de contabilidad adecuados a satisfacción de Don Juan Suárez, quien podrá revisarlos tantas y cuantas veces lo estimare necesario; (d)—Todo el personal de la finca será empleado por don José Suárez, de acuerdo con Don Juan Suárez; (e)—En cuanto a la venta de los frutos Don José Suárez deberá consultar a Don Juan Suárez y obtener su conformidad en cuanto a precio y condiciones de venta; (f)—Don José Suárez se compromete a consultar y obtener la conformidad de Don Juan Suárez para cualquier acto de administración que no sean los rutinarios del cultivo de las plantaciones; y muy especialmente sobre el precio de venta de los productos y las personas a quienes se hagan dichas ventas; (g)—Don José Suárez abrirá una cuenta especial en un banco de San Juan, donde se depositarán todos los dineros producidos por la administración y contra la cual se girará para satisfacer sus gastos. Los cheques serán firmados por Don José Suárez y contrasignados por Don Juan Suárez; (h)—Al finalizar cada año se llevará a cabo un balance y liquidación de todos los negocios llevados a cabo durante el año; y los beneficios obtenidos se repartirán por igual entre ambas partes, deduciéndose de la parte de Don José, los seis mil dólares tomados para sus gastos personales; (i)—Si durante la vigencia de este contrato falleciera cualquiera de los otorgantes, el superviviente continuará o asumirá la administración de las fincas, según fuere el caso; y los herederos del fallecido recibirán la parte proporcional de los beneficios mientras dure el término del contrato."

Por contrato privado suscrito en 26 de febrero de 1948 ante el Notario Víctor A. Coll, don Marcial Suárez y su esposa doña Encarnación Fuentes, de una parte, y don Juan Suárez y su esposa doña Aida Miranda y don José Suárez y su esposa doña Celia Cestero de la otra parte, convienen y se obligan a: "PRIMERO:—Don Marcial Suárez y Doña Encarnación Fuentes y Don Juan Suárez y Doña Aida Miranda por

escritura número tres otorgada ante el Notario Público de esta Capital, Lcdo. Víctor A. Coll el dos de febrero de mil novecientos cuarenta y ocho, celebraron un contrato de arrendamiento de fincas rústicas, cuyo contrato en todos sus extremos y a los efectos consiguientes se tendrá como parte de este convenio; SEGUNDO:—Don Juan Suárez y su esposa Doña Aida Miranda, y Don José Suárez y su esposa Doña Celia Cestero, por escritura número cuatro ante el Notario de esta capital, Don Víctor A. Coll, de cuatro de febrero de mil novecientos cuarenta y ocho, llevaron a cabo un contrato de subarriendo y administración de varias fincas rústicas, cuyo contrato en todos sus extremos y a los efectos consiguientes, se tendrá como parte de este convenio, así como el acta aclaratoria firmada ante el mismo Notario, el mismo día con el número cinco de su protocolo y referente a la escritura anterior; TERCERO:—Que el día dos de febrero de mil novecientos cuarenta y ocho Don Marcial Suárez y su esposa Doña Encarnación Fuentes, y Don Juan Suárez otorgaron un documento privado, pero autenticado ante el Notario Víctor A. Coll en la misma fecha, cuyo documento privado, por virtud del presente convenio, se acuerda por las partes protocolarlo, elevándolo a escritura pública en el protocolo del Notario Sr. Coll; y todas sus obligaciones se hacen parte de este convenio; CUARTO:—Que como adición a las cláusulas, obligaciones y convenio constantes en los anteriores documentos, las partes aquí hacen las siguientes adiciones: 'A'—Es expresamente convenido que la casa-habitación principal existente en la finca descrita con la letra 'A' en la escritura de arrendamiento número tres de dos de febrero de mil novecientos cuarenta y ocho, conocida por el nombre de 'Finca Herrera', así como una extensión de dos cuerdas a su alrededor permanecerán en posesión de Don Marcial Suárez y su esposa Doña Encarnación Fuentes mientras ellos vivan; pero que, tanto Don Juan como Don José, tendrán el derecho de habitación en dicho inmueble, solos o con sus respectivas familias, bajo la autoridad de los esposos Suárez-Fuentes. Y es convenido

expresamente que dicho inmueble se usará exclusivamente para estos fines y para ningún otros; se hace constar que el uso de la casa de Herrera a que se refiere este contrato por cualquiera de las partes, se refiere exclusivamente a su servicio como casa-habitación y en ningún momento se podrá entender que ninguna de las partes tendrá el derecho de impedir que las oficinas, garages y demás establecimientos necesarios para la explotación de las fincas sean cambiados, desalojados o en cualquier forma impedidos de utilizarse para estos fines; 'B'—La cláusula en la cual se estipula el precio del arrendamiento de las fincas entre los esposos Suárez Fuentes y Don Juan Suárez será de doce mil dólares anuales durante los primeros diez años y ocho mil dólares en caso de prórroga; 'C'—Todas las obligaciones asumidas por Don Juan Suárez en el contrato de arrendamiento continúan vigentes mientras dure el subarrendamiento; y el término del subarrendamiento será exactamente igual al del arrendamiento; 'D'—Cualquiera de las partes en este contrato tendrá el derecho de ordenar que el mismo y el otro contrato privado firmado aclarando el contrato de arrendamiento sea protocolado por un Notario Público de esta Capital y elevado a escritura pública; 'E'—En caso de ciclones, temporales, huracanes o vientos fuertes, plagas en las palmas, o cualquier otro desastre análogo, las partes contratantes se pondrán de acuerdo, ya sea por sí, o por medio de representantes, para modificar este contrato de acuerdo con las circunstancias. Se expresa además que las partes contratantes renuncian al derecho a que tienen de recurrir a los tribunales; y en vez de este derecho, se nombraría a una tercera persona seleccionada de mutuo acuerdo, siempre que se haga imposible una avenencia entre los interesados;

"En caso de que ocurran los desastres mencionados en el párrafo anterior, se modificará el contrato de acuerdo con la situación y por convenio de las partes a este contrato, reduciéndose el canon de arrendamiento en los contratos de arrendamiento y subarrendamiento proporcionalmente a la

pérdida que sufra la producción; 'F"—En cuanto a las mejoras, se modificará el contrato de arrendamiento en el sentido de que las mismas, o el valor que representen, se dividirán por partes iguales entre el arrendatario y el subarrendatario."

Examinados en su totalidad los documentos que mejor reflejan el negocio jurídico que llevan a cabo las partes, tanto en sus aspectos públicos como en sus aspectos privados o secretos, se ve claro, que no estamos ante una relación típica de "comunidad de bienes" ni de "arrendamiento" sino ante una estructura más compleja, en la cual tanto el negocio urbano como el negocio agrícola, se encuentran íntimamente relacionados entre sí, y en la cual, cada una de las partes envueltas, se encuentra en cierta relación fiduciaria con la otra. No se produce aquí la total y completa transmisión de derechos que pudiera esclarecer la naturaleza de los negocios y la situación de las partes dentro de los mismos. ■

Ahora bien, la pregunta que debemos contestarnos es la siguiente: ¿Constituye esta relación, en derecho contributivo estricto, una sociedad especial o atípica o empresa común? La ley aplicable al caso es la sección 2 (a) (3) de la Ley número 74 de 6 de agosto de 1925, según enmendada por la Ley número 31 de 12 de abril de 1941, —13 L.P.R.A. 512, sección 632—que dispone: "El término sociedad incluirá las sociedades civiles, mercantiles, industriales, agrícolas, profesionales o de cualquiera otra índole, conste o no su constitución en escritura pública o documento privado e incluirá además, cuando dos o más personas bajo un nombre común o no se dediquen a una empresa común con fines de lucro."

En nuestra jurisprudencia hemos esclarecido algunos de los puntos referentes a esta cuestión. En el caso de *Puig* v. *Tribunal de Contribuciones*, 65 D.P.R. 734 (De Jesús) (1946), cita precisa a la pág. 739, se resuelve, que la mera comunidad de bienes no constituye una empresa común para

fines de lucro, si se mantiene su operación jurídica dentro de su peculiar esfera de recibir las rentas, sin aportar los bienes en común a una operación distinta a la natural operación de la comunidad; en el caso de *Vías* v. *Tribunal de Contribuciones*, 67 D.P.R. 491 (Todd hijo), (1947), cita precisa a la pág. 495, se resuelve, que se pueden transformar los bienes dentro de una comunidad, destruyendo sus anteriores estructuras y construyendo otras, sin que tal operación presuponga una empresa común; en el caso de *Tesorero* v. *Tribunal de Contribuciones*, 70 D.P.R. 99 (Todd hijo), (1949), cita precisa a la pág. 110, se resuelve, que si los bienes en común se aportan a un negocio distinto al de la natural operación de recibir individualmente la renta en común, queda convertida la comunidad en una empresa de lucro; en el caso de *Calaf* v. *Tribunal de Contribuciones*, 73 D.P.R. 812 (Marrero), (1952), cita precisa a la pág. 818, se resuelve, que si bien la mera existencia de una comunidad no constituye una sociedad a los fines de la sección 2 (a) 3, "si dicha comunidad se dedica a un negocio común para beneficio mutuo de los condóminos, queda claramente constituida una sociedad a los fines de la citada sección". Como se ve, los casos hasta ahora estudiados por nuestra jurisprudencia, se refieren especialmente a la distinción que debe establecerse entre lo que constituye una comunidad de bienes de acuerdo con nuestro Derecho Civil y una sociedad especial o empresa común de acuerdo con nuestro Derecho contributivo.

Constituyendo la denominación "empresa común" una modalidad del concepto genérico "sociedad", según la define la sección 2(a)(3) de nuestra Ley de Contribución sobre Ingresos de 1924, según enmendada, tal vez sea aconsejable, en casos que no se refieran a la comunidad de bienes, establecer ciertas normas adicionales para determinar la existencia de una "empresa común" cuando se trate del uso o disfrute de un derecho sobre una cosa perteneciente a otra persona, como es el caso del arrendamiento. Como es de esperar, algunas de las normas aceptadas por el Derecho contri-

butivo para determinar el establecimiento de una "empresa común", son las mismas que se utilizarían para descubrir la existencia de una "sociedad" contributiva.

Sin que ninguna de las normas aquí formuladas pueda considerarse como esencial al establecimiento de una sociedad, en Derecho contributivo estricto, las siguientes pueden considerarse como indicativas de la asistencia de tal sociedad: (1) interés común en la ganancia; (2) responsabilidad común en las deudas y en las pérdidas, aunque un acuerdo expreso para no compartir la pérdida no es esencial a la constitución de la sociedad; (3) responsabilidad común en la dirección de los negocios de la sociedad, pero está bien reconocida la excepción que una sociedad puede existir aunque la dirección de la misma esté confiada en mayor proporción a un solo socio; (4) contribución común para la adquisición de la propiedad social, pero esta indicación tiene escaso valor, pues se considera que puede constituirse una sociedad aunque uno solo de los socios sea el dueño de la propiedad y el capital social consista meramente en el derecho del otro socio de usar la propiedad del primero, como es el caso de los socios industriales en Puerto Rico; (5) el trabajo común de los socios, aunque se admite la posibilidad del socio que no trabaje *(inactive partner)*, como es el caso de los socios comanditarios en Puerto Rico; (6) que no exista prohibición de enajenar o traspasar cualquier propiedad o interés de la sociedad, aunque la inclusión de tal restricción no debe considerarse como que equivalga a negar la existencia de la sociedad. ▆

Se considera como prueba pertinente a la constitución de la sociedad, la forma de contabilizar sus operaciones de negocio aunque no se considere prueba concluyente; la forma de presentarse *(representation)* ante el público; la forma como se ha informado a los agentes del gobierno los negocios de la sociedad; a nombre de quién se realizan las compras y cómo se ha conseguido crédito en la plaza; el nombre utilizado para otorgar contratos y asumir obligaciones; a nom-

bre de quién se ha abierto una cuenta bancaria; a nombre de quién se han presentado las acciones judiciales o reclamaciones ante los organismos del Estado; la existencia de contratos sociales. En cuanto a este último medio de prueba, aunque en los contratos se diga que las partes no han tenido la intención de constituir una empresa común o una sociedad, si los acuerdos y las motivaciones de las partes, así lo demuestran, se considerará que tal empresa común o sociedad quedó establecida a los fines contributivos correspondientes: 6 Mertens—*The Law of Federal Income Taxation* 111 et seq., Secciones 35.03 y 35.04 ■

En el suplemento correspondiente al año 1956 de la obra antes citada, se recoge el caso de *Tate* v. *Knox*, 131 F. Supp. 514, (Donovan), (1955), cita precisa a la pág. 517, en el cual se resuelve que existe una empresa común tan pronto se prueban los siguientes hechos: (a) aportación *(contribution)* de dinero, propiedad, tiempo o destreza en un empeño común *(common undertaking)*; (b) un interés propietario conjunto y un manejo mutuo del negocio; (c) participación en las ganancias, aparte de cualquier retribución recibida en concepto de sueldo, y aunque no haya participación en las pérdidas; (d) un contrato expreso o implícito que demuestre, como cuestión de hecho, el establecimiento de una empresa común. ■

En cuanto al edificio de apartamientos, es indudable que de acuerdo con el contrato privado, suscrito el 2 de febrero de 1948 por don Marcial Suárez y su esposa doña Encarnación Fuentes y don Juan Suárez Fuentes aceptado por don José Suárez Fuentes en el contrato privado suscrito por los tres y sus respectivas esposas el 26 de febrero de 1948, el total de los beneficios del negocio agrícola debe aplicarse al pago de la hipoteca que grava el negocio urbano, sobre el cual, retienen, don Marcial Suárez y su esposa un usufructo, habiéndose establecido en virtud de la operación de los dos negocios cierta relación fiduciaria entre las tres partes enenvueltas, puesto que los que operan el negocio agrícola son

responsables del pago del precio del negocio urbano y de asegurar un derecho de usufructo.　No es ésta una relación típica de acreedor y deudor, sino una administración de ciertos bienes aportados por una persona y explotados por otras dos para obtener un beneficio común.　■

En cuanto al negocio agrícola hay, además de la prueba documental ya reseñada, abundante prueba documental que no deja lugar a dudas, que don Juan y don José Suárez Fuentes contabilizaban las operaciones mercantiles como si se tratara de una empresa común, se presentaban al público en el timbre de sus cartas como si fueran una sola identidad, reportaban sus ganancias al gobierno como una sociedad, tenían cuentas bancarias conjuntas, con cheques impresos a nombre de los dos, se comunicaban con las autoridades estatales como si tuvieran establecidas una sociedad y, de acuerdo, con los términos del contrato de subarriendo y administración de que antes se ha hablado, giraban conjuntamente contra los fondos bancarios comunes y realizaban indistintamente gestiones de administración, y asumieron conjuntamente las obligaciones con la Puerto Rico Coconut Industries, Inc.　El hecho aislado que don José Suárez Fuentes no participara en las pérdidas de la explotación del negocio agrícola, no altera la conclusión de la empresa común, puesto que tanto el Derecho Contributivo como el Derecho Civil, reconocen la simple aportación de trabajo o destreza como un interés propietario de naturaleza social, suficiente al establecimiento de una empresa común o sociedad especial.

*Debe confirmarse la sentencia en cuanto declara la constitución de una empresa común sobre los inmuebles comprendidos en el edificio de apartamientos y revocarse en cuanto declara no estar constituida dicha empresa común sobre los inmuebles arrendados, por ser la conclusión de este Tribunal que dicha empresa común está constituida sobre ambos cuerpos de bienes.*