Kenneth W. Hall and L. Deane Hall v. Commissioner.
Hall v. Commissioner
Docket No. 382-67.
United States Tax Court
T.C. Memo 1968-175; 1968 Tax Ct. Memo LEXIS 125; 27 T.C.M. (CCH) 860; T.C.M. (RIA) 68175; August 8, 1968. Filed *125 Edward A. Rauscher, 1313 Washington Bldg., Seattle, Wash., for the petitioners. Lee A. Kamp, for respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies of $3,499.41 and $4,360.95 in petitioners' income tax for the taxable years 1963 and 1964, respectively. The issue for decision is whether gain which petitioners realized from the subdivision and sale of inherited real property is taxable as capital gain or ordinary income. Petitioners do not dispute that they will owe additional self-employment tax, the amount of which is included in the above-stated deficiencies, if it is held that the gain is ordinary income. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Kenneth W. Hall and L. Deane Hall are husband and wife. They filed Federal joint income tax returns for the taxable years 1963 and 1964 with the district director of internal revenue, Tacoma, Washington. They were legal residents of Pullman, Washington, when they filed the petition in this case. Because L. Deane Hall is a party to this case *126 only by virtue of filing joint returns with her husband, Kenneth W. Hall, the latter is hereinafter referred to as petitioner. The property involved herein is a 301-acre farm situated on the northwestern boundary of Pullman, Washington. Petitioner's father acquired 160 acres of the property in 1909 from his father. Petitioner's father acquired the remaining acreage in 1942. In 1961 the Washington State Highway Department condemned 11 acres of the property for a highway. [1] The property is sometimes hereinafter referred to as the family farm or the family place. In 1960 petitioner's mother died leaving her community interest in the property to petitioner subject to a life estate in petitioner's father. In 1961 petitioner and his father, who was then 80 years old, entered into an agreement partitioning the property. Under the agreement, each of them received 861 approximately one-half of the property outright. In 1964 petitioner's father died leaving all his interest in the property to petitioner. Pullman is a relatively small town in southeastern *127 Washington. Its primary business is agriculture. The campus of Washington State University is located in the town. The center of Pullman is about 20 blocks, or about a ten-minute drive, from the family farm. Pullman is growing rapidly. Its population in 1960, aside from students enrolled at the University, was about 10,000. At that time there was an expectation that the community would expand by about 1,000 people per year for ten years. This expectation is in the process of being realized. The population in 1967, aside from students enrolled at the University, was about 17,000. Washington State University is also expanding. Total enrollments in 1966 were about 10,000. The enrollment is expected to reach 13,000 by 1970. Petitioner was born on the family farm in 1914. He has always had an interest in farming. At the time of the trial herein, petitioner belonged to the following farm organizations: Whelan Grange Pullman Grain Growers Pullman Grain Supply Pacific Co-op U.S.D.A.District Soil Conservation Petitioner's principal occupation has always been farming. When he finished his schooling in 1938, he returned to the family farm to work. After farming for two years, *128 he entered the military service. In 1945, after completing his military service, he resumed his farming career. He operated on a sharecrop basis, in effect leasing the family farm from his father for a portion of the crops grown. He continued to farm the family place until 1965. [2] After harvesting the crops in 1965, he began leasing the family place to another man to farm. Under this arrangement, petitioner received one-third of the crops grown. Since 1965 petitioner has worked for the lessee of the family place doing various farming operations. In 1955 there was a change in the Government wheat program which reduced to 25 percent the area of the family farm which petitioner was allowed to plant in wheat. This change caused peitioner's farming operations to become unprofitable. He attempted to remedy the situation by purchasing additional land close enough to the family place to include it in his farming operations. He was not able, however, to buy any of the land he wanted. As a result of these difficulties, petitioner sustained a cumulative loss of about $9,000 on his farming *129 operations during the years 1957 to 1965. At about the time that his farming operations became unprofitable, petitioner began doing intermittent part-time work in a hydraulics laboratory at Washington State University and at a plumbing store. He took the work because of the unprofitableness of his farming operations. He kept these jobs until about 1960, when there was no more work available at either place of employment. From about 1959 to 1961 petitioner's wife also supplemented their income by operating a beauty shop in their home. After his mother's death in 1960, petitioner decided to sell his interest in the family place and get out of farming. [3] Aside from his land, he had little or no assets at the time. His farming operations had been unprofitable for about five years. Furthermore, there was no prospect of an improvement in his farming business because of the impossibility of acquiring more land which could be worked into his operation. Petitioner considered making, and was willing to make, a single sale of his entire interest in the *130 family farm. [4] He concluded, however, that he could not get a fair price for the land by selling it in this way. [5] As farmland the family place was only worth $250 to $500 an acre. Because of the proximity of the land to Pullman, and because of Pullman's anticipated growth rate, petitioner believed that the land had a potential value for residential purposes of $1,500 to $2,500 an acre. He did not believe, however, that he had a reasonable chance of realizing this higher value through a bulk sale to a real estate developer. 862 Because of his conclusion that he could not *131 realize the full value of his land by making a single sale of it, petitioner decided to subdivide it for residential use and sell individual parcels. His sole purpose in subdividing the land was to liquidate his inheritance. He had no desire or intention to get into a real estate business. In order to subdivide the family farm, petitioner considered it necessary to obtain water and sewerage disposal from the city of Pullman. Petitioner found that the city of Pullman would supply these to a portion of the family farm only if it were annexed to the city. In order to annex part of the farm to Pullman, it was necessary to present subdivision plats to the Pullman Planning Commission and appear at its meetings to gain approval of the plats. Furthermore, the city of Pullman conditioned annexation upon petitioner's promise that certain improvements to the land would be made. These were to grade and gravel the streets and to install water, sanitary, and storm sewers. Petitioner had to post a bond to insure completion of the improvements. By the time of the trial herein, petitioner had subdivided three portions of the family farm. The following chart contains information with respect to *132 the three subdivisions: 2
3
Subdivision
Kenneth Hall
Hall's Second
Hall's Third
1
Addition
Addition
Subdivision
Addition
Acres
23
18 5/8
35
Lots
132 Combined
140
Subdivision Plat
Sept. 1961
May 1963
Jan. 1967
Originally Sub-
mitted
Subdivision Annexed
Nov. 1962
Oct. 1963
Oct. 1967
Lots Sold
Combined Figures
(Subdivisions 1 &
2)
1963
39
1964
11
1965
43
1966
15
1967
17
21
Number of Sales
Combined Figures
Transactions
(Subdivisions 1 &
2)
1963
10
1964
11
1965
14
1966
8
From 1962 to 1964, it cost petitioner the following amounts to develop subdivisions 1 and 2: 1962
$18,188
1963
45,065
1964
28.739
Total
$91,992 In 1966 and 1967, it cost petitioner the following amounts to develop subdivision 3: 1966
$30,558
1967
50,000
Total
$80,558 Thus, it has cost petitioner a total of $172,550 to develop the three subdivisions. The only improvements made to the subdivided portions of the family farm were those which petitioner understood to be required by local subdivision law. The improvements were so minimal *133 that petitioner was unable to obtain F.H.A. approval of the subdivisions. In addition to the improvements which petitioner understood to be required by local subdivision law, the F.H.A. required paved streets, storm gutters, curbs, and sidewalks, none of which were put into the subdivided portions of the family farm. Petitioner spent approximately 50 days per year during 1963 and 1964 supervising and working on the physical development of the subdivisions. [6] He supervised all the development work, except the installation of water lines. The city of Pullman independently contracted this task and billed petitioner for a portion of the cost. Petitioner's labor on the subdivisions included bulldozing with his own "track-tractor." 863 During the years 1962 to 1964, inclusive, he bulldozed for a total of approximately 400 hours. During these same years, petitioner laid the necessary sewer pipes in the subdivisions with the help of employees. In addition *134 to the time which petitioner spent supervising and working on the physical development of the subdivisions, he spent time with city and county officials attending to the legal requirements of subdividing. He personally appeared before various authorities to secure plat and zoning approval for and annexation of the subdivisions. Petitioner's personal activity in connection with the subdivisions did not interfere with his farming. Even after the development of the subdivisions had begun, the undeveloped portions of the family place continued to be farmed. [7]
In subdividing and developing portions of the family farm, petitioner was aided by the following outside help: Professional surveyor who drew up required legal descriptions Accountant Contract services to blast, excavate, and grade roads Contract services to dig ditches for sewer pipes *135 Attorney and engineer to help obtain plat approval Real estate broker Petitioner's real estate broker is Baenen Realty Agency of Pullman (hereinafter referred to as Baenen) with whom he has an exclusive listing agreement. All efforts to sell the lots in the three subdivisions have been carried on by Baenen. Petitioner first contacted Baenen two or three months after Pullman annexed the first subdivision in November 1962. Baenen did not assist petitioner in obtaining various zoning classifications for the three subdivisions. Nor did Baenen assist petitioner in the steps leading up to Pullman's annexation of the subdivisions. At the request of petitioner's accountant, Baenen from time to time prepares comprehensive lists of the unsold lots in the three subdivisions. On the lists, the various lots are briefly identified and a price is set down by each one. [8] Baenen and petitioner jointly determine these prices with an eye to comparable lots being sold elsewhere in and around Pullman. Petitioner relies to a reasonable extent upon Baenen's suggestions in determining the prices. The prices on the lists serve as a guide to Baenen in dealing with potential buyers. If a buyer offers *136 a lesser amount, Baenen discusses the offer with petitioner. As a result of this process, sales are sometimes consummated at a price lower than that shown on the lists. The Pullman City Council zoned the three subdivisions to allow single dwellings, multiple dwellings, and apartments on the lots therein. Petitioner has never constructed or participated in the construction of any building on any lot in the three subdivisions. In subdivisions 1 and 2, 90 percent of the lots sold have homes constructed on them ranging in value from $23,000 to $40,000. Of this 90 percent, most of the lots contain homes with a value of $25,000 to $27,000. Petitioner and Baenen are generally hopeful that purchasers of the lots will construct homes with a value somewhere between $25,000 and $40,000. Petitioner does not, however, maintain any control over what is done to a lot after it is sold. Petitioner is not personally involved in selling the lots in the three subdivisions. He does no advertising and if a potential buyer seeks him out, he immediately refers the buyer to Baenen. Baenen's *137 advertising is limited to one sign on the property and to a catch-all ad in the local newspaper. The ad lists all the properties being sold by Baenen, including lots owned by people other than petitioner. Petitioner has never purchased land for subdividing and selling. Petitioner has never held either a real estate broker's license or a real estate salesman's license. He has had no experience in real estate other than in liquidating his inheritance. He has no intention of going into the real estate business in any way. In his Federal income tax returns for 1963 and 1964, petitioner treated his gain from the sale of lots in the subdivisions as capital gain. These returns included a computation of self-employment tax based on petitioner's farming activities. In his statutory notice of deficiency for 1963 and 1964, respondent treated petitioner's 864 gain from the sale of lots in the subdivisions as ordinary income. He also increased petitioner's self-employment tax on the theory that he was engaged in a real estate development business during 1963 and 1964. Opinion The issue is whether gain which petitioner realized from subdividing and selling parts of the family farm *138 is taxable as capital gain or ordinary income. The parties agree that the issue hinges upon the question whether petitioner held the subdivided portions of the farm "for sale to customers in the ordinary course of [a] trade or business" within the meaning of section 1221(1), Internal Revenue Code of 1954. [9]
The question presented has been litigated numerous times. While opinions dealing with the question often appear inharmonious, certain areas of agreement emerge. Courts agree that it is not necessary to review the decided cases in detail, because the question must be resolved on the basis of the peculiar facts of each case. Furthermore, there are various factors *139 which might help to reach a decision. Among these are the manner of acquiring the property, the extent of improvements made to the land, the amount of promotional or advertising activity carried on, the number and frequency of sales, whether the taxpayer purchased new land to replace the parcels he sold, and the extent to which the taxpayer was otherwise involved in a real estate business. Finally, courts agree that no single factor is controlling and that the weight to be given a factor varies with each case. The ultimate question we must resolve, with the help of factors such as those listed above, is for what purpose did petitioner hold the subdivided portions of the family farm. Mauldin v. Commissioner, 95 F. 2d 714, at 717 (C.A. 10, 1952), affirming 16 T.C. 698 (1951); S. O. Bynum, 46 T.C. 295, at 299 (1966). Did petitioner hold the land for the purpose of selling an inherited asset at a reasonable price? Or did he hold it for the purpose of engaging in a real estate business, using the land as inventory or stock in trade? On the basis of the record as a whole, we think petitioner proved that he did not hold the subdivided land for the *140 purpose of engaging in a real estate business. Petitioner has always been a farmer. He had no experience with real estate prior to inheriting the family farm. He has never held a real estate broker's license or a real estate salesman's license. When petitioner inherited the family farm, he had practically no other assets. His farming operations were not successful. He decided that the only use for his inheritance was to sell it. As farmland, he could get $250 to $500 an acre. He believed, however, that the land had a potential value for residential purposes of up to $2,500 an acre. He furthermore believed that no real estate developer would give him this amount. He therefore decided to develop the land himself. To this end, he made what he understood to be minimum improvements required by local subdivision law. Petitioner did no advertising or promotional work in connection with the subdivision. His real estate agent did only a minimal amount of advertising. Petitioner did not buy additional land to replace parcels which were sold. Nor did he construct any buildings on the land. This case is factually distinguishable from the cases cited by respondent. In view of the nature of the *141 question before us, we do not think a detailed discussion of these cases is necessary. [10]
On the basis of the record as a whole, we conclude that petitioner did not hold the subdivided portions of the family farm "for sale to customers in the ordinary course of [a] trade or business." We accordingly hold that his realized gain from the sale of the subdivided land is taxable as capital gain. Decision will be entered for the petitioners. 865 Footnotes
1. The condemnation payments ranged from $1,000 an acre for land nearest to Pullman to $300 an acre for land farthest from Pullman.↩
2. Petitioner's subdividing activities, described later reduced the acreage suitable for farming.↩
3. Petitioner apparently carried this decision over to the rest of the family farm when he inherited it from his father in 1964.↩
4. When petitioner engaged a real estate agent in 1962, he expressed his willingness to make a single sale of his interest in the family farm. The agent has never received an offer to make a single purchase of the unsubdivided portions of the farm. Petitioner has listed the unsubdivided acreage at $3,000 per acre. ↩
5. For this reason, petitioner never attempted to make a bulk sale of the land in his capacity as executor of his mother's and father's estates. Nor did petitioner, in his capacity as executor of the two estates, advertise the availability of the property for sale in the local newspapers.↩
6. Of these 50 days, about 12 were spent on weed control which petitioner understood to be required by law. Petitioner thought the weed control requirement would have been applicable even if he had not subdivided the land.↩
7. During 1963 and 1964, petitioner contracted with outsiders to do some heavy equipment work, such as combining, in connection with his farming operations. Petitioner apparently did not own sufficient equipment to do the work himself. The record is silent as to whether petitioner entered into similar contracts in other years.↩
8. On the 1968 list, the prices range from $1,000 to $4,500, with most of them in the area of $2,500 to $4,000.↩
9. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩
10. For a discussion of several cases in this area, including one upon which respondent relies, see Estate of Josephine Clay Simpson, T.C. Memo. 1962-71↩.